PDK/FRAUD: USAO 2025R00179

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * CRIMINAL NO. 25-CR-141 |
| | * |
| WALTER BARNES, | * (Conspiracy to Commit Bribery of a |
| | * Public Official and Securities Fraud, |
| Defendant | * 18 U.S.C. § 371; Forfeiture, |
| | * 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. |
| | * § 853(p), 28 U.S.C. § 2461(c)) |
| | * |

*******

### INFORMATION

The United States of America charges that:

#### Relevant Individuals and Entities

At all times relevant to this Information, with all dates being approximate and inclusive:

1. The defendant, **WALTER BARNES** ("**BARNES**"), a Maryland resident, was the founder, owner, and president of Company 1, which was headquartered in Towson, Maryland. Company 2 provided consulting and other services to United States government agencies, including USAID.

2. Coconspirator 1 (CC-1), a Maryland resident, was a contracting officer at USAID from in or around 2009 through in or around 2023.

3. Coconspirator 2 (CC-2), a Florida resident, was the president of Company 2, which was headquartered in Washington, D.C. Company 2 contracted with United States government agencies, including USAID, to provide administrative and technology services.

4. Coconspirator 3 (CC-3), a Maryland resident, was the president of Company 3, which was headquartered in Fulton, Maryland, and contracted with United States government agencies to provide Information Technology services.

5. Company 4 was a small business investment company in Maryland.

## COUNT ONE
### (Conspiracy to Commit Bribery of a Public Official and Securities Fraud)

6. Paragraphs 1 through 5 of this Information are alleged and incorporated by reference as if set out in full.

7. Between in and around 2013 and in and around 2023, in the District of Maryland and elsewhere, the defendant,

**WALTER BARNES,**

did knowingly combine, conspire, confederate, and agree with CC-1, and others, known and unknown, to commit offenses against the United States, namely:

    a. bribery of a public official, that is, to corruptly give a thing of value to a public official with intent to influence an official act, in violation of 18 U.S.C. § 201(b)(1)(A); and

    b. securities fraud, that is, to knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and facilities of national securities exchanges, in connection with the purchase and sale of securities, use and employ, and cause others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. §§ 240.10b-5 and 240.10b5-2.

### Objects of the Conspiracy

8. The objects of the conspiracy were for **BARNES** and his coconspirators to: (a) unjustly enrich themselves by providing money and other things of value to CC-1, a public official, in return for CC-1 being influenced to help secure USAID contracts; (b) to unjustly enrich themselves by obtaining money from investors at a private equity company through material misrepresentations and omissions made by **BARNES** and CC-1 that related to Company 1's performance on USAID contracts; and (c) to conceal the conspiracy and the coconspirators' overt acts in furtherance of the conspiracy.

### Manner and Means

9. It was part of the conspiracy that **BARNES** and his coconspirators bribed CC-1 repeatedly—through multiple payments and other things of value, gifts, and favors—in exchange for CC-1's agreeing to influence the award of USAID contracts valued at hundreds of millions of dollars to **BARNES**'s company (Company 1), and CC-2's company (Company 2).

10. It was part of the conspiracy that **BARNES** obtained and retained government contracts with USAID, including prime contracts through Company 1, and at least one subcontract through Company 2.

11. The conspiracy involved at least fourteen USAID prime contracts, valued at approximately $552.5 million, that were awarded in exchange for bribes, including:

   a. between in and around 2013 and in and around 2015, the award of four contracts to Company 2 valued at approximately $54.7 million; and

   b. between in and around 2018 and in and around 2022, the award of seven contracts to Company 1, and bids on three additional contracts, valued at approximately $497.8 million.

12. Throughout the conspiracy, **BARNES** and his coconspirators regularly paid

various bribes to CC-1 including cash, iPhones, laptops, thousands of dollars in tickets to a suite at an NBA game, a country club wedding, downpayments on two residential mortgages, cashier checks to pay off debt for a vacation at Martha's Vinyard, as well as intangible benefits like jobs for relatives. Ultimately, **BARNES** and his coconspirators paid CC-1 numerous bribes collectively valued at more than $1 million.

13. It was also part of the conspiracy that **BARNES** and CC-1 schemed to defraud Company 4 and its underlying investors through material misrepresentations and omissions of material facts while negotiating Company 4's investment in Company 1 through a Credit Agreement.

## Overt Acts

14. In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the District of Maryland and elsewhere:

   a. On or about July 31, 2018, shortly before USAID awarded **BARNES** and Company 1 its first prime contract, CC-1 discussed with CC-3 how he would approach **BARNES** to ask for payments. CC-1 texted CC-3, "I[']m starting money talk with [**BARNES**] just to test the water[.]" CC-3 replied, "Do your thing my brother[.]" CC-1 later texted CC-3, "I[']m sure you appreciate the PRE work that goes into all of this—and it[']s work[.] Just to get people [in] the program office to see things my way[.]"

   b. On or about May 6, 2021, **BARNES** made the first of several payments, $2,500, for a country club wedding for CC-1, which cost over $30,000.

   c. On or about July 1, 2021, **BARNES'** company, Company 1, wired $34,500 to CC-3's company, Company 3, which submitted a sham company invoice to

4

**BARNES** to conceal the payment, $30,000 of which CC-3 transferred to CC-1 in four separate payments that same week.

   d. On or about March 8, 2022, CC-3 transferred $6,500 to CC-1, which was the same amount of money that **BARNES** had transferred to CC-3 on or about that same day.

   e. In or around March 2022, at **BARNES**' request, CC-1 spoke with Company 4 about Company 1's performance as a government contractor on USAID contracts—an endorsement that induced Company 4 to enter into a credit agreement, in part, by omitting the material fact that **BARNES** had regularly bribed CC-1 to obtain USAID contracts for years. The credit agreement that **BARNES** and CC-1 fraudulently induced Company 4 into executing caused Company 4 to extend Company 1 a $14 million loan, and caused Company 1 to issue stock warrants that, if exercised, would result in Company 4 having a 40% equity stake in Company 1.

   f. After Company 4 disbursed the $14 million loan to Company 1, $4 million of the proceeds were frozen until Company 1 received a contract, which occurred through CC-1, who **BARNES** continued to bribe. **BARNES** thereafter transferred millions of the loan to a Company 1 brokerage account in which **BARNES** invested the funds, after which **BARNES** transferred approximately $395,383.37 in investment returns to **BARNES**'s personal brokerage account.

   g. In or around August 2022, CC-1 provided **BARNES** with a technical evaluation package containing confidential source-selection information as to the status of proposals submitted by Company 1's competitors for the award of a contract with a value of approximately $143 million. The package included USAID's assessment of the strengths and weaknesses of bids, which indicated that Company 1 was not the top candidate.

5

    h.  During the same month and next month, **BARNES** withdrew funds from a Company 1 account to buy cashier's checks totaling more than $50,000, which were used to pay debts of CC-1.

    i.  On or about January 18, 2023, around which time the scheme came to USAID's attention but was not fully revealed, CC-1 texted **BARNES**, "Was told today that we are back at business as usual. That there are no findings. … From me to you. We can't get lax ever again. Gotta stay tight. This coulda [sic] gone way worse. I gotta admit to you that I was way pissed at how all of this happened as I am sure you can understand." **BARNES** replied, "Yes but understand and I feel horrible and sorry about it all."

18 U.S.C. § 371.

## FORFEITURE ALLEGATION

The United States of America further alleges that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c) in the event of the defendant's conviction under Count One of this Information.

2. Upon conviction of the offense alleged in Count One of this Information, the defendant,

**WALTER BARNES,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

### Substitute Assets

3. If, as a result of any act or omission of the defendant, any of the property described above as being subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

Date: 5/7/25

/s/ Lorinda Laryea
Lorinda Laryea
Acting Chief
United States Department of Justice
Criminal Division, Fraud Section

Date: 5/7/25

Kelly O. Hayes /PDK
Kelly O. Hayes
United States Attorney
United States Attorney's Office
District of Maryland