## ATTACHMENT A
## STATEMENT OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

### RELEVANT INDIVIDUALS AND ENTITIES

At all times relevant to the offense:

Defendant **WALTER BARNES** ("**BARNES**") was the President of Company 1, a government contractor headquartered in Maryland. Company 1 had a Washington, D.C. office in the same building as headquarters for the United States Agency for International Development (USAID), which was a government agency responsible for distributing foreign aid. Company 1 was also a certified small business under the Small Business Administration (SBA) 8(a) contracting program for socially and economically disadvantaged businesses.

Coconspirator 1 (CC-1) was a USAID contracting officer who, in exchange for bribes, influenced the award of contracts to **BARNES** and Company 1 and to Coconspirator 2 (CC-2) and Company 2.

CC-2 was the President of Company 2, which was headquartered in Washington, D.C., and which contracted with USAID to provide various services. At times, CC-2 and Company 2 hired **BARNES** and Company 1 to serve as a subcontractor on contracts and vice versa.

Coconspirator 3 (CC-3) was the President of Company 3, which was headquartered in Maryland, and which at times was hired by **BARNES** and Company 1 to serve as a subcontractor on USAID contracts.

Coconspirator 4 (CC-4) worked at Company 2 and then was hired by USAID where CC-4 eventually became a contracting officer.

Company 4 was a private equity firm based in Maryland that invested in various companies.

### THE BRIBERY SCHEME

Between in or around 2013 and 2023, **BARNES**, CC-2, and CC-3 conspired with CC-1 to pay bribes to CC-1 in exchange for CC-1 agreeing to influence official acts related to approximately $543.6 million dollars' worth of USAID contracts to Company 1 and Company 2, as listed in the following table:

|    | Timeframe   | Contractor | Subcontractor   | Contract Description    | Value         |
|----|-------------|------------|-----------------|-------------------------|---------------|
| 1) | 2013-2018   | Company 2  | None            | Staffing Contract       | $4.8 million  |
| 2) | 2014-2020   | Company 2  | Company 1       | Institutional Support   | $37.1 million |
| 3) | 2015-2015   | Company 2  | None            | Knowledge Management    | $22,000       |
| 4) | 2015-2018   | Company 2  | None            | Communications Support  | $3.9 million  |
| 5) | 2018-2023   | Company 1  | Company 3       | Professional Management | $30 million   |
| 6) | 2018-2023   | Company 1  | Company 2 and 3 | Professional Management | $25.5 million |
| 7) | 2018-2022   | Company 1  | Company 3       | Administrative Support  | $3.5 million  |
| 8) | 2019-2025   | Company 1  | None            | Cybersecurity           | $19.5 million |
| 9) | 2020-2022   | Company 1  | Company 2       | Technical Support       | $28.5 million |
| 10)| 2022-2027   | Company 1  | Company 3       | Administrative Support  | $9 million    |
| 11)| 2022-2027   | Company 1  | None            | Technical Support       | $95 million   |
| 12)| Not Awarded | Company 1  | None            | Planning and Learning   | $143 million  |
| 13)| Not Awarded | Company 1  | None            | Planning and Learning   | $94 million   |
| 14)| Not Awarded | Company 1  | None            | Professional Management | $49.8 million |
| **Approximate Total Value of Contracts** | | | | | **$543.6 million** |

A.   **Company 2 Prime Contracts 1-4 (Appx. Value of $45.8 Million)**

On or about April 30, 2013, CC-2 emailed **BARNES** that CC-2 was going "to USAID Administrator's Office to close this sole source deal." That same day, Company 2 obtained its first USAID contract. CC-2 then began to give CC-1 bribe payments for USAID contracts. Company 2 obtained its second USAID Contract in or around September 2014.

On or about June 22, 2015, **BARNES** and Company 1 became a subcontractor to Company 2 on Contract 2. Within approximately three months, when CC-1 became the contracting officer representative on Contract 2, Barnes and Company 1 hired CC-1's relative as a bribe and at the request of CC-2. Specifically, on or about August 19, 2015, CC-2 texted CC-3 about hiring CC-1's relative: "I like him a lot. Time for you to hire him!!! I can't because of [CC-1]. But I'm going to get him employed by one of my colleagues with these good companies that are our size." Instead of CC-3 hiring CC-1's relative, **BARNES** hired CC-1's relative to work at Company 1 from in or around October 2015 to October 2017, during which two-year period Company 1 continued serving as a subcontractor on the second USAID contract, which CC-1 continued to oversee.

In or around 2017, when Company 2 graduated from the SBA's 8(a) program and was ineligible to be a prime contractor for new USAID contracts under this program, the conspiracy shifted such that Barnes and Company 1 became the USAID prime contractor, and Company 2 served as Company 1's subcontractor on contracts awarded through CC-1.

**B.     Company 1 Prime Contracts 5-14 (Appx. Value of $497.8 Million)**

   **i.     Contract 5 (Awarded, Appx. Value of $30 Million)**

On or about April 27, 2017, **BARNES** and CC-3 texted to discuss a strategy for Company 1 to obtain contracts via CC-1. The next month, in reply to a text from **BARNES** about a meeting with CC-1, CC-3 noted, "[CC-1] is bugging me about the money so I will ask again tonight."

**BARNES** replied, "about paying him or what we will allocate?"

CC-3 replied, "His current payment[.]"

**BARNES** replied, "So you're going to the bank right?"

CC-3 replied, "when the money hits my account."

On or about March 1, 2018, CC-3 texted **BARNES**, "Send [CC-1] your cap [capability] statement. There maybe [sic] a sole source [contract] in our future. Big money[.]"

**BARNES** replied, "Ok will do[.]"

CC-3 replied, "[CC-1] needs it for tomorrow morning."

**BARNES** replied, "Sent[.]"

In the email sent to CC-1, **BARNES** stated, "Mr. [CC-1], Please see the attached capability statement. Feel free to contact me with any questions."

On or about March 27, 2018, CC-3 and CC-1 continued to discuss whether **BARNES** and Company 1 could serve as the prime contractor on a USAID contract. CC-1 texted CC-3, "Will need to have a discussion with you [CC-3] and [BARNES] about a [Request for Proposal] that I'll need to put out. Have to decide on an approach[.]"

To aid that discussion, CC-3 texted **BARNES**, "What's your Thursday or Friday afternoon look like? [CC-1] wants to discuss a Rfp he [is] putting out."

The next day, CC-1 emailed both **BARNES** and CC-3: "[L]et me know if your firm has 'near' capability to either lead/manage or JV [joint venture]." CC-1 attached a "Market Research Memo," which listed 18 small businesses capable of completing the contract (which did not list Company 1); and a statement of work for the contract with the following label, "[PROCUREMENT SENSITIVE_ DO NOT SHARE]".

On or about March 29, 2018, two days after CC-1 shared the procurement-sensitive information, CC-3 texted **BARNES** about buying a suite to watch a basketball game, "$3000 for the suite next Friday. You good?"

BARNES replied, "Call me[.]"

CC-3 later texted CC-1, "Don't be asking questions. Getting a suite for the [W]izards game."

CC-1 replied, "Phase One has been approved[.]"

On or about April 24, 2018, **BARNES** texted CC-3 about arranging "a sit down w[ith] [CC-1] again" to "iron out agreement[.]" Five days later, **BARNES** texted CC-3, "Good meet up w [CC-1.]"

CC-3 replied that **BARNES** "cleared things up. Moving forward everyone is going to be happy[.]"

On or about May 3, 2018, CC-1 emailed **BARNES** and CC-3: "Please find attached a [Request for Information] that requires response prior to providing your firm consideration of a Sole Source Award[.]" **BARNES** then emailed CC-1 a response from Company 1 and Company 3.

On or about July 31, 2018, shortly before USAID awarded **BARNES** and Company 1 its first prime contract, CC-1 discussed with CC-3 how he would approach **BARNES** to ask for payments. CC-1 texted CC-3, "I[']m starting money talk with [BARNES] just to test the water[.]"

CC-3 replied, "Do your thing my brother[.]"

CC-1 later texted CC-3, "I[']m sure you appreciate the PRE work that goes into all of this— and it[']s work[.] Just to get people [in] the program office to see things my way[.]" A couple weeks later, USAID awarded **BARNES** and Company 1 its first contract (Contract 5).

  ii.  **Contracts 6, 7 (Awarded, Appx. Value of $29 Million)**

On or about September 11, 2018, USAID awarded **BARNES** and Company 1 a second contract, for which Company 2 was a subcontractor. In the email, CC-1 formally referred to **BARNES** as "Mr." and stated: "Please also provide times . . . to meet for a formal award kickoff meeting with me ... Congratulations on your award and your future work with USAID." On or about October 3, 2018, **BARNES** and Company 1 were awarded their third USAID contract.

  iii. **Contract 8 (Awarded, Appx. Value of $19.5 Million)**

In or around the summer of 2019, **BARNES** and his coconspirators continued to discuss the bribery scheme. For example, emails and text messages among **BARNES**, CC-3, and CC-1 on or about July 10 and 11, 2019, show that they met at a restaurant shortly before USAID awarded Company 1 another contract. After exchanging texts about the meeting, **BARNES** replied on July 11, "[S]ee y'all there," and a few hours later, "At the bar, got a table for three[.]" On or about August 16, 2019, **BARNES** and Company 1 were awarded their fourth contract.

### iv. Contract 9 (Awarded, Appx. Value of $28.5 Million)

In or around the months leading to USAID's award of a fifth contract to **BARNES** and Company 1, **BARNES**, CC-2, CC-3, and CC-1 continued engaging in the bribe scheme. On or about January 2, 2020, **BARNES** texted CC-3, "Has [Company 2] paid you yet?" The next day, **BARNES** texted CC-3, "Did [Company 2] get back to you?" On or about January 7, 2020, **BARNES** texted CC-3, "Did [Company 2] pay you?"

CC-3 replied, "[I'm] on the phone with [CC-2]." CC-3 funneled monthly payments to CC-1 that increased around this time from $4,000 to $7,500. Furthermore, CC-1 had requested the increased bribe payments.

On or about January 13, 2020, **BARNES** arranged for CC-3's company (Company 3) to serve as a subcontractor to **BARNES** and Company 1 on a USAID contract. That day, CC-1 emailed **BARNES** and blind carbon copied CC-3. The email included a document titled, "USAID endorsement letter to [Company 3]." This was an official USAID letter from CC-1 to **BARNES** and Company 1, which stated Company 1 was "requesting to add [Company 3] to this contract as a sub-contractor." The letter also stated: "It is to my [CC-1's] understanding that [Company 3] brings a capability in agile solutions and IT managed services which will support [Company 1] in satisfying their contractual requirements on both the unclassified side and classified support side up to Top Secret level." CC-1 thereafter approved **BARNES'** request to add Company 3 as a subcontractor.

In or around July 2020, **BARNES** and Company 1 were awarded their fifth USAID contract for which Company 2 served as a subcontractor.

### v. Contracts 10, 11 (Awarded, Appx. Value of $104 Million)

In or around 2021, **BARNES** paid for a country club wedding for CC-1, which cost over $30,000. Prior to paying the balance, **BARNES** arranged with CC-3 to use a sham company and invoice to send $30,000 to CC-1. In or around August 2021, following CC-1's wedding, **BARNES** continued to transfer payments to CC-1 via Company 1 and Company 3 (through CC-3 as an intermediary). Examples of such transfers include CC-3 transferring to CC-1 the same amount of money that **BARNES** transferred to CC-3 on the same day. During this time, **BARNES** and Company 1 were awarded their sixth and seventh USAID contracts.

### vi. Contract 12 (Not Awarded, Appx. Value of $143 Million)

After Company 1 received seven contracts from USAID, **BARNES** attempted to obtain more by steering bribes and receiving confidential procurement information from CC-1. In or around August 2022, CC-1 provided **BARNES** with a technical evaluation package containing confidential source-selection information as to the status of proposals Company 1's competitors submitted for the award of a contract with a value of approximately $143 million (Contract 12). The package included USAID's assessment of the strengths and weaknesses of bids indicating Company 1 was not the top candidate. During the same month and next month, **BARNES**

5

withdrew funds from a Company 1 account to buy cashier's checks totaling more than $50,000, which were used to pay debts of CC-1 and CC-4.

In or around October 2022, as the evaluation of bids was ongoing, **BARNES** paid CC-1 and CC-4 approximately $60,000 in two transfers from CC-3. CC-1 used some of these payments at a closing on a new home. The next month, CC-1 submitted to the lender a "Gift Letter" which falsely listed **BARNES** as "Cousin" and which related to two of the above-described checks.

### vii.     Contracts 13, 14 (Not Awarded, Appx. Value of $143.8 Million)

On or about January 18, 2023, around which time the scheme came to USAID's attention, CC-1 texted **BARNES**, "Was told today that we are back at business as usual. That there are no findings. ... From me to you. We can't get lax ever again. Gotta stay tight. This coulda [sic] gone way worse. I gotta admit to you that I was way pissed at how all of this happened as I am sure you can understand."

**BARNES** replied, "Yes but understand and I feel horrible and sorry about it all." Having not been fully revealed, the scheme continued, but no additional contracts were awarded to Company 1 as a result.

As part of the bribery scheme summarized above, **BARNES** intended to profit and influence official acts by corruptly giving, offering, and promising things of value to a public official with the intent to influence official acts, including but not limited to official acts related to USAID contracts awarded to **BARNES**'s company (Company 1) and Company 2.

### THE SECURITIES FRAUD SCHEME

In 2022, and in furtherance of their ongoing bribe scheme, **BARNES** and CC-1 defrauded Company 4, including one of its investment pools that was licensed by the SBA as a small business investment company (SBIC).

**BARNES** and CC-1 fraudulently induced Company 4 into executing a Credit Agreement with Company 1 in which **BARNES** caused Company 1 to issue stock warrants that, if exercised, would result in Company 4 having a 40% equity stake in Company 1. The Credit Agreement through which **BARNES** caused the transfer of the stock warrants contained several terms, including a $14 million loan to Company 1. An additional term required that Company 4 pay a nominal value for the warrants (one cent for each or approximately $40). Another term provided that **BARNES** could pay himself a dividend from the loan of up to $10 million.

During the scheme, CC-1 agreed at **BARNES**' request to speak with Company 4 about Company 1's performance as a government contractor on USAID contracts—an endorsement which induced Company 4 to enter into the Credit Agreement, in part, by omitting the material fact that **BARNES** had regularly bribed CC-1 to obtain USAID contracts for years.

**BARNES** induced Company 4 to reach a deal with Company 1 through materially false representations in the Credit Agreement. For example, Section 5.16 ("Compliance with Laws") states, "Each of the Loan Parties and each Subsidiary is in compliance in all material respects with

6

the requirements of all Laws applicable to it[.]" This representation was materially false because the scheme had been ongoing at the time that **BARNES** signed the Credit Agreement.

**BARNES** and CC-1 also omitted material information about specific contracts to induce Company 4 to enter into the Credit Agreement. For example, Section 5.20 of the Credit Agreement ("Material Agreements") provides more specificity about certain contracts, including those that, in truth and in fact, were procured through bribes: "A complete and accurate list of all Material Contracts of the Borrower and its Subsidiaries as of the Closing Date is set forth on Schedule 5.20." Schedule 5.20 of the Credit Agreement lists four USAID contracts that CC-1 had awarded or influenced in exchange for bribes from **BARNES**.

[cont'd]

In addition, **BARNES** made the materially false representation that he did not obtain such contracts—or any contracts—through bribery or fraud: Section 5.24 of the Credit Agreement ("Government Contracts") provides that no party "offered ... any unlawful bribe ... to any ... government official or employee [or] procured a contract ... through fraud or collusion." In fact, by the time that **BARNES** made these representations to Company 4, Company 1 had secured five USAID contracts through bribery. Then, the day after **BARNES** signed the Credit Agreement (March 22, 2022), Company 1 was awarded through CC-1 a USAID contract valued at $9 million (Contract 10). Moreover, approximately six weeks later, Company 1 was awarded through CC-1 a contract valued at $95 million (Contract 11). **BARNES** was paying bribes to CC-1 throughout this same period.

SO STIPULATED:

        Lorinda I. Laryea
        Acting Chief
        U.S. Department of Justice
        Criminal Division, Fraud Section

        _____
        Matt Kahn
        Brandon Burkart
        Trial Attorneys
        U.S. Department of Justice
        Criminal Division, Fraud Section

        Kelly O. Hayes
        United States Attorney
        District of Maryland

        _____
        Patrick D. Kibbe
        Assistant United States Attorney
        District of Maryland

        _____
        Walter Barnes
        Defendant

        _____
        Barry Pollack, Esq.
        Harris St. Laurent & Wechsler LLP
        *Counsel for the Defendant*